## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **JAMES GILMORE WILSON,** | ) | **Chapter 7** |
| | ) | **Case No. 17-12895-JEB** |
| Debtor | ) | |
| | ) | |
| | ) | |
| **JANE TORTOLA, JOAN OLSZESKI, and JUDY HOLCOMB,** | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | **Adversary Proceeding** |
| | ) | **No. 17-01140-JEB** |
| **JAMES GILMORE WILSON,** | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OF DECISION

This matter came before the Court on the Amended Complaint filed by the Plaintiffs, Jane Tortola, Joan Olszeski, and Judy Holcomb (collectively "Olszeskis") against the defendant and debtor, James Gilmore Wilson. Pursuant to the Complaint, the Olszeskis seek a determination that the debt owed by Wilson to the Olszeskis in the principal amount of $3.53 million is nondischargeable pursuant to Section 523(a)(2) of the Code. For the reasons set forth below, the Court finds that the debt of Wilson to the Olszeskis is discharged since the Olszeskis have failed to sustain their burden of proof that it should be excepted from discharge.

This Memorandum of Decision constitutes the findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable to this proceeding by Fed. R. Bankr. P. 7052. The findings set forth in this Memorandum are based on the record as a whole and may be supported by testimony and exhibits that are not specifically cited. Any finding of fact deemed a

conclusion of law is adopted as such, and vice-versa. Findings of fact may also be set forth in the Analysis section in connection with the application of the law.

### PROCEDURAL BACKGROUND

On August 3, 2017, Wilson commenced bankruptcy proceedings under Chapter 7 of the Code. The Olszeskis commenced this adversary proceeding on November 13, 2017. The Debtor was granted a discharge of all other debts on November 22, 2017.

After Wilson filed a motion to dismiss the initial complaint, the Olszeskis filed an opposition and the Amended Complaint. The Court denied the motion to dismiss and the case proceeded based on the Amended Complaint. In the Amended Complaint, the Olszeskis asserted that the debt in the principal amount of $3.53 million is excepted from discharge under Section 523(a)(2) based on false representations, false pretenses, and actual fraud by Wilson. They allege that Wilson made false representations on which they relied when they entered into a transaction to sell stock and receive a promissory note dated May 31, 2006, in the amount of $3.53 million ("Note") as part of the compensation. In addition, they allege that the debt is nondischargeable based on subsequent actions by Wilson, including fraudulent conveyances that Wilson caused his related entities to make, which stymied their efforts to collect on the Note.

After discovery, the parties submitted a Joint Pretrial Memorandum which set forth certain stipulated facts and narrowed the issues of law and fact. The Court conducted an evidentiary trial by video on March 1, 2021, March 2, 2021, and March 25, 2021. By agreement, direct testimony was submitted by way of affidavit, with additional direct testimony at trial and the opportunity for cross-examination. The parties also by agreement submitted the deposition testimony of Edward Simches from another proceeding. Wilson submitted certain excerpts of the deposition transcripts of the Olszeskis. In addition to the foregoing evidence, 110 exhibits were

admitted at trial.

**JURISDICTION**

The Court has jurisdiction over the Complaint since it arises under Section 523 of the
Bankruptcy Code. 11 U.S.C. § 523. Pursuant to Section 1334(b) of title 28, the district courts
have jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases
under title 11," subject to exceptions not applicable here. 28 U.S.C. § 1334(b). By a standing
order of reference in accordance with 28 U.S.C. § 157(a), the district court in this district has
referred all cases under title 11 and any proceedings arising under, arising in, or related to cases
under title 11, to the bankruptcy court. *See* 28 U.S.C. § 157(a). The determination of the
dischargeability of a debt is a core proceeding in bankruptcy. 28 U.S.C. § 157(b)(2)(I).
Accordingly, this Court may hear and finally determine this matter.

**APPLICABLE LAW AND BURDEN OF PROOF**

Section 523(a) of the Code sets forth the debts that are excepted from an individual
debtor's discharge. 11 U.S.C. § 523(a). Consistent with the "fresh start" policy of the Code,
exceptions to a debtor's discharge are narrowly construed. *In re Stewart*, 948 F.3d 509, 520
(1st Cir. 2020). The creditor bears the burden to show that the debt "comes squarely within" an
exception. *In re Spigel*, 260 F.3d 27, 32 (1st Cir. 2001). The standard of proof is a preponderance
of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991).

Section 523(a)(2)(A) excepts from discharge "any debt . . . for money, property, services,
or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a
false representation, or actual fraud[.]" 11 U.S.C. § 523(a)(2)(A). Each of the three categories –
false pretenses, false representation, and actual fraud – are separate types of misconduct,
although they have overlapping elements. *In re Curran*, 554 B.R. 272, 284–85 (B.A.P. 1st Cir.

3

2016), *aff'd*, 855 F.3d 19 (1st Cir. 2017).

To prevail on a claim for false representation, the creditor must demonstrate the following elements:

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

*In re Stewart*, 948 F.3d at 520 (further citations omitted). Each of the elements must be proven, or the creditor will fail to prevail. *Palmacci v. Umpierrez*, 121 F.3d 781, 787–88 (1st Cir. 1997). False pretenses requires the same six elements, except that the false representation is replaced by an "implied misrepresentation or a false impression created by conduct of the debtor." *In re Curran*, 554 B.R. at 285 (further citations omitted).

Actual fraud is broader in scope and construed in light of the traditional common law definition. *In re Stewart*, 948 F.3d at 521. It "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *In re Lawson*, 791 F.3d 214, 219 (1st Cir. 2015) (further citations omitted). It requires wrongful intent and cannot be implied by law. *In re Stewart*, 948 F.3d at 521.

Fraudulent conveyances which involve actual intent to hinder, delay or defraud creditors are included within the scope of actual fraud, even though there may be no fraudulent representation. *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 366, 136 S. Ct. 1581, 1590 (2016). As a result, the recipient of a fraudulent conveyance who participates with the requisite intent may be liable to a creditor if the debt is "traceable" to the transfer. *Id.* at 365. But the Supreme Court in *Husky* did not eliminate the requirement that the debt be "obtained by" or traceable to the fraud. *In re Gaddy*, 977 F.3d 1051, 1057 (11th Cir. 2020). A subsequent

4

fraudulent conveyance does not convert an existing debt that is otherwise dischargeable into a nondischargeable debt. *See id.* at 1058.

**FINDINGS OF FACT**

The following findings of fact are based on the testimony of the witnesses through affidavits and testimony at trial, the exhibits submitted at trial, and the agreed upon facts in the Joint Pretrial Memorandum. The Court has not included facts or background that are not relevant to this decision. The Court has also not reconciled minor discrepancies, unless material or relevant to the rulings.

The Olszeskis are sisters. From 1983 to June 1, 2006, they were the only shareholders of Olszeski Properties, Inc. Olszeski Properties originally operated a chain of supermarkets. Around 2000, Olszeski Properties sold the stores to a corporation which operated a chain of supermarkets known as Giant Eagle. The corporation and its affiliates, including the Tamarkin Company, will be referred to as "Giant Eagle."

After the sale of the supermarkets, beginning as of 2000, the principal assets of Olszeski Properties were three commercial shopping centers located in Ohio. The shopping centers were known as Hartville Centre ("Hartville"), Green Super Center or Green Giant Eagle Plaza ("Green"), and Oakwood Square Plaza or Oakwood Plaza ("Oakwood"). Giant Eagle was the anchor tenant or sole tenant in each of the shopping centers.

In the early 2000's, Giant Eagle was the anchor tenant at Oakwood, leasing approximately 42,000 square feet. Giant Eagle's lease at Oakwood ("Lease") did not expire until

2015. Under the Lease, Giant Eagle had the exclusive right to operate a supermarket or grocery store

> which exclusive privilege shall also include, but not be limited to, a store or department for the operation of a bakery or delicatessen, for video rentals or sales, or for the sale, display or merchandising of meat, sea food, frozen foods, prepared chicken, produce, floral products, greetings cards, photo finishing, dairy products, baked goods or any other type of food or grocery products. The exclusive [sic] shall also include the operation of a pharmacy. The foregoing shall not prevent any other tenant in the Center from selling the aforesaid food items as an incidental part of its retail operation so long as the total number of square feet devoted to display for the sale of such products does not exceed the lesser or (a) five percent (5%) of the total square feet of building area leased by such tenant, or (b) five hundred (500) square feet….

Exhibit 16, p.13-14.

In addition, the Lease precluded the landlord from leasing space to other types of tenants, prohibiting the shopping center premises to be used

> for any non-retail purposes, including entertainment purposes such as a cinema or theater, skating rink, bowling alley, bar, discotheque, dance hall, night club, full service sit-down restaurant, amusement gallery, pool room, health spa, gymnasium, massage parlor, adult book store, video game room, arcades or other amusement facilities, waste facilities, stockyards or facilities containing animals (other than small pet stores), funeral homes, medical offices, clinics or facilities, schools, trailer, mobile home or vehicle sales, leasing or rear facilities, [or] car wash….

Exhibit 16, p.14.

Under the Lease, Giant Eagle could cease operations and "go dark," provided that it continued to pay the rent. Although the landlord could terminate the Lease for the cessation of operations, the landlord was precluded from renting to a grocery store or supermarket for 10 years from the date of the Lease of April 7, 2000. Sometime in the early 2000's, prior to 2004, Giant Eagle ceased operations at Oakwood and opened a new supermarket two miles away. Giant Eagle continued to pay rent at Oakwood under the Lease.

In 2004, the Olszeskis engaged Amy Bolan, a broker with Realty Executives

Commitment, to sell Oakwood. In addition to the Giant Eagle space that was vacant, there was approximately 40,000 square feet of vacant space at Oakwood from and after 2004.

In February 2005, Wilson learned of Oakwood through Bolan. He began discussions regarding a potential acquisition of Oakwood. After initially expressing interest in Oakwood, the negotiations expanded to include Hartville and Green. The Olszeskis were only interested in selling Hartville and Green if the buyer bought Oakwood.

Wilson met with the Olszeskis personally only once or twice during the negotiations, which extended almost 18 months. At the meetings, he discussed generally his plans for Oakwood. None of the Olszeskis had a specific recollection of the discussions or any representations made by Wilson at those meetings.

The negotiations extended from February 2005 through May 2006. Michael Tortola, ex-husband of Jane Tortola, was president of Olszeski Properties in 2005 and 2006. Andy Zumbar, a lawyer at the time with the firm of Lundgren Goldthorpe and Zumbar, was counsel to Olszeski Properties. Michael Tortola and Zumbar handled the negotiations on behalf of Olszeski Properties and the Olszeskis, who were its shareholders. Wilson negotiated directly with Zumbar and Michael Tortola regarding the business terms of the acquisition of the shopping centers. Wilson's legal counsel, Edward V. Cannon, Jr., of Doherty, Ciechanowski, Dugan & Cannon, P.C., reviewed and prepared legal documents. None of the Olszeskis personally participated in the negotiations of the terms of the acquisition with Wilson.

While the negotiations were ongoing, Oakwood remained on the market. Some inquiries regarding the property were made. However, no one else pursued any negotiations beyond the inquiry phase or made an offer for Oakwood.

During the negotiations, the structure of the transaction changed. The initial discussions

involved a sale of the real estate. After further discussions, the transaction was structured as a stock sale to address tax issues. Throughout the period, including at the closing, the parties continued to negotiate other terms and conditions of the acquisition, including the timing of the payments and any security.

The final payment terms of the acquisition were that Wilson would purchase the stock in Olszeski Properties from the Olszeskis in exchange for (i) payment of $6.5 million at the closing, (ii) a $500,000 promissory note ("$500,000 Note") payable over three years without interest, and (iii) the Note, in the amount of $3.53 million, with no interest and no payments for three years. A draft unsigned agreement dated December 2005 was submitted into evidence, but no final agreement was submitted into evidence.

During the negotiations, Wilson reached out to Giant Eagle to discuss the Lease. Wilson communicated with Michele Sponholz, a Senior Vice President for Giant Eagle, regarding a potential release and buyout of the Lease. Sponholz indicated a willingness to discuss such a termination. Based on her initial response, Wilson believed that he could negotiate a termination of the Lease at Oakwood. He explored options with several other potential tenants. Based on the assumption that he could attract new tenants, he prepared projections and drawings of potential changes to Oakwood. Both Wilson and Bolan testified credibly that any changes to Oakwood and its facade would differ depending on any new anchor tenant.

Pine Street Investment Company, LLC, or Pine Street Management Company, LLC, was an entity wholly owned by Wilson. (Since it is unclear from the record whether there was one or two entities, both will be referred to collectively as "Pine Street.") The original negotiations contemplated that Pine Street would purchase the stock of Olszeski Properties. However, to avoid tax consequences, the purchaser was changed to Wilson personally.

To fund the cash to be paid at closing, Wilson required financing secured by the shopping centers. Wilson formed HG Ohio, Inc., ("HG") to acquire Hartville and Green from Olszeski Properties once he was a shareholder. He also formed OP Ohio, Inc., ("OP") to acquire Oakwood.

Wilson negotiated a loan from KeyBank National Association ("KeyBank") to HG, to refinance the existing debt on Hartville and Green and provide additional funds for the stock acquisition. The KeyBank loan was structured as a conduit loan, to be sold on the secondary market. The note provided for a 10-year term, secured by mortgages on Hartville and Green, and contained prepayment penalties. HG was established as a special purpose entity. Its organizational documents required that the only debt of HG would be the obligations to KeyBank and trade payables. The note issued by HG to KeyBank was submitted in evidence, but did not contain any restrictions on HG's operations or debt. No other documents for the KeyBank loan were submitted into evidence.

Wilson also negotiated a loan from Huntington Bank to OP, secured by a mortgage on Oakwood. In addition to OP, Wilson and Olszeski Properties were obligors on the note. The Huntington note provided for payments of interest and principal over three years, with the balance due on June 1, 2009. In addition, the loan provided for a paydown if there was a buyout or termination of the Lease. Finally, Huntington required a subordination agreement for any other debt of OP.

The closing took place over two days on May 31, 2006, and June 1, 2006, at Zumbar's offices. It involved multiple steps including (i) the acquisition of stock in Olszeski Properties by Wilson, (ii) the sale of Hartville and Green to HG, financed by the loan from KeyBank which paid off existing debt of the properties, (iii) the sale of Oakwood to OP, financed by the loan

from Huntington which paid off existing debt on the property, and (iv) the net loan proceeds paid

to Wilson to be paid to the Olszeskis (or for their benefit) for their stock. Wilson was present

with his counsel. In addition to Zumbar, Michael Tortola and the Olszeskis attended. Amy Bolan

was also present. No one from KeyBank or Huntington attended. During the closing, the parties

consulted with their respective counsel in separate rooms.

The final $500,000 Note and the Note were prepared as obligations jointly of Wilson and

OP. In addition, as part of the transaction, HG executed a guaranty of all obligations of  Wilson

and OP. The Note was due and payable in full on June 1, 2009. The Note did not provide for

interest or any payments during the term of the Note. The Note expressly stated that it was

subordinated to the payment of the note to Huntington. Although it referenced collateral, no

security agreement or mortgage was executed. The Note also contained a clause that permitted

the maturity date to be extended for one year by agreement of the parties in exchange for a

$300,000 extension fee.

Prior to the closing, Zumbar negotiated a subordination agreement with Huntington

related to the Note. At the closing, the Olszeskis executed the Subordination Agreement with

Huntington dated June 1, 2006. Pursuant to the Subordination Agreement, the Olszeskis agreed

to subordinate the $500,000 Note and the Note to the obligations of OP to Huntington if there

was a default.

At the closing, Wilson asked the Olszeskis to enter into a "No Lien Agreement"

regarding HG. The Olszeskis were unaware of the request prior to the closing. The No Lien

Agreement provided that the Olszeskis waived any right to attach, lien or secure any assets or

income of HG. The No Lien Agreement expressly referred to the KeyBank loan and provided

that the Olszeskis would indemnify KeyBank for any breach of the covenants. The No Lien

Agreement also included a provision that the parties had consulted with counsel.

The Olszeskis were represented by Zumbar throughout the closing. Although Zumbar did not recall specific documents, he testified that he would have reviewed and discussed the documents with his clients, the Olszeskis. The Olszeskis each confirmed their signature on the No Lien Agreement and the Subordination Agreement. The Court finds that the Olszeskis knowingly and voluntarily executed the No Lien Agreement and the Subordination Agreement.

At the closing, the parties negotiated an additional agreement dated May 31, 2006, among the Olszeskis, Wilson, HG and OP ("Additional Agreement"). Under the Additional Agreement, the Olszeskis were granted a right of first refusal to purchase the real property and assume the debts if HG or OP sold the shopping centers. The Additional Agreement also provided for paydowns on the Note if any of the shopping centers were sold. Pursuant to the Additional Agreement, Wilson agreed that Jane Tortola would be a member of the board of HG and OP, but only as a minority voting interest, and at all times a minority voting interest to Wilson's voting interest. The Additional Agreement also required regular financial statements to be provided to the Olszeskis.

Wilson believed that the No Lien Agreement resolved any issues with the KeyBank loan. He relied on his counsel for the legal issues, including the structure for HG. The only loan document from KeyBank in evidence was a promissory note of HG to KeyBank. The promissory note did not contain any restrictions on HG's ability to incur additional debt. There was no evidence submitted of a default or demand by KeyBank for any reason, including because of HG's guaranty of the Note and the $500,000 Note.

At the closing, the $6.5 million payment was made to the Olszeskis or for their benefit to pay off debts they owed personally. Prior to June 1, 2009, no payments were due to the Olszeskis

on the Note. The Olszeskis were also not entitled to any distributions from any of the entities. The only payments the Olszeskis were to receive after the closing and prior to June 1, 2009, were the monthly payments under the $500,000 Note. The monthly payments on the $500,000 Note were made, although some payments were made late. The $500,000 Note was paid in full prior to June 1, 2009.

After the closing, Wilson was the sole owner of HG, OP, and Olszeski Properties. The Olszeskis retained no ownership in Olszeski Properties, OP or HG. Wilson testified that he took distributions as sole owner of the entities. In his deposition, Edward Simches testified that any payments made from HG and OP to Wilson or on behalf of Wilson were recorded as distributions to Wilson as the owner.

Pine Street entered into a management agreement with OP and HG to manage the shopping centers. Wilson had several other businesses that he owned directly or with partners in addition to Pine Street, Olszeski Properties, OP and HG. Simches testified that payments to Pine Street were recorded either for the management fee or as distributions to Wilson. In addition, he testified that any intercompany payments were recorded with an account for the related entities, showing if payments were made to or on behalf of another entity, or as between OP and HG. He also testified that there was a corresponding entry on the related entities' books.

At least one board of directors meeting of HG and OP was held. No evidence was submitted as to when and how frequently HG and OP were required to conduct board meetings. No evidence of the bylaws of HG and OP were submitted.

After the closing, Wilson continued his efforts to negotiate a buyout of the Lease with Giant Eagle, or permission for other tenants to occupy the space. Giant Eagle did not agree to a buyout and did not permit any exceptions to its exclusivity provisions. After repeated attempts

12

by Wilson, Giant Eagle stopped responding to him. Wilson also sought to obtain additional

financing for Oakwood. But since Oakwood continued to have over 60% vacant space, such

efforts were also unsuccessful.

On June 1, 2009, the Note became due. Prior to the maturity, Wilson sought an extension

of the Note. The Olszeskis did not refinance, forbear, or extend the maturity date of the Note. In

June 2009, they commenced litigation against Wilson, OP, and HG.

In November 2009, OP and HG commenced bankruptcy proceedings in Ohio. In

connection with the filing, Wilson signed a clerk's certificate stating that the board of directors

of HG had adopted resolutions authorizing the filing. Wilson admitted that he did not notify Jane

Tortola about the resolutions or any vote regarding the bankruptcy. The bankruptcy proceedings

of both OP and HG were later dismissed. No evidence was presented regarding when or why the

bankruptcy proceedings were dismissed.

In a separate state court proceeding, the Olszeskis obtained a judgment against certain

affiliates and family members of Wilson, based on transfers from HG and OP that were

determined to be fraudulent transfers. Wilson was not a party to the state court litigation.

**EVIDENTIARY RULINGS ON TESTIMONY**

The Court allowed the affidavits and testimony to be submitted at trial, but reserved

ruling on certain objections raised for later determination. In particular, the Court reserved issues

on relevancy of certain testimony and objections on the grounds that such testimony was based

on hearsay and not within the personal knowledge of the witness.

Having considered the testimony and the arguments, the Court sustains the objections of

Wilson to testimony by Jack B. Cooper and Zumbar as to transfers by HG and OP. Cooper and

Zumbar represented the Olszeskis in litigation against Wilson seeking to collect on the sums due

under the Note. Both testified as fact witnesses, not expert witnesses. Cooper and Zumbar each

testified regarding documents they reviewed in connection with the litigation. The Court finds

that the testimony was not based on personal knowledge, since neither Cooper or Zumbar

prepared or maintained the business records they discussed. In addition, since both Cooper and

Zumbar were testifying as fact witnesses, not experts on financial accounting or fraudulent

conveyances, the Court will not consider any conclusions that Cooper or Zumbar made as to

whether there was consideration for the transfers or whether the transfers were fraudulent

conveyances.

The Court also sustains the objection by Wilson to the testimony of Kevin Doherty,

finding that the testimony was not relevant. Doherty testified by way of affidavit and testimony

at trial regarding a transaction with Wilson in which Doherty was to acquire a percentage of the

stock ownership of OP and another entity. He testified that the transaction was intended to

qualify for a Section 1031 exchange under the tax code. Although the affidavit referred to an

exhibit, none was attached. The transaction has no bearing on or relation to the Note or the

agreements with the Olszeskis. The Olszeskis had no ownership in OP and nothing in the Note or

Additional Agreement precluded the sale or transfer of stock in OP by Wilson.

**ANALYSIS**

The Olszeskis failed to sustain their burden of proof to show that the debt of $3.53

million is nondischargeable under Section 523(a)(2). They have failed to show by a

preponderance of the evidence that Wilson made specific representations to them at the time the

Note was given, that he made the representations with the intent to deceive them, and that they

were justified in relying on the representation. In addition, the Court finds that the Olszeskis

failed to show that the debt of $3.53 million was traceable to actual fraud. Although the

Olszeskis raise issues about their efforts to collect the debt, those actions occurred well after the original debt was incurred under the Note on May 31, 2006. The debt of $3.53 million was not "obtained by" or traceable to actions taken years later. Even if the Olszeskis had asserted a debt arising from such later actions, the Olszeskis have failed to show by a preponderance of the evidence that Wilson engaged in transfers with the fraudulent intent to hinder, delay or defraud the Olszeskis.

The Olszeskis failed to show that specific representations were made at the time the Note was given. The Court finds that there is no evidence that Wilson made a specific representation to the Olszeskis that he would invest additional funds to renovate Oakwood. Wilson testified that he discussed alternatives as to how the Oakwood property would be renovated, depending on the new tenant. But he testified that any renovations were premised on the ability to obtain a release from Giant Eagle of the restrictions on other tenants at Oakwood or a release of the Lease. Both Wilson and Bolan testified credibly that any renovations would differ depending on the needs of the new anchor tenant.

Wilson's testimony regarding his efforts to negotiate with Giant Eagle and to obtain new tenants was credible. It was also consistent with the record as a whole. Wilson negotiated a loan with Huntington that included an early payout if he successfully terminated the Lease. There was evidence of his ongoing communications with Giant Eagle and others in efforts to obtain a new tenant after the closing. As the former owners of Oakwood who negotiated the restrictions under the Lease, the Olszeskis were well aware of the problems faced by the landlord due to the Lease.

Moreover, however, there is no evidence that if any such representation was made, the Olszeskis relied on such a representation. The Olszeskis could not remember when or if they met with Wilson before the closing. Each of them acknowledged that all the negotiations were

conducted through Zumbar and Michael Tortola. Neither Zumbar nor Michael Tortola testified

as to any representations by Wilson regarding investing funds to make the proposed changes, or

that any such representations were relied upon in negotiating the terms of the acquisition and the

Note.

The Court also finds that there were no misrepresentations or false pretenses regarding

the No Lien Agreement or the Subordination Agreement. Zumbar testified credibly that he would

have reviewed all the documents and explained the documents to the Olszeskis. Zumbar also

testified that he negotiated the Subordination Agreement prior to the closing. Finally, the Note

incorporates the subordination provisions. In addition, because of the No Lien Agreement, the

parties negotiated the Additional Agreement, giving the Olszeskis other protections. The Court

finds that each of the Olszeskis knowingly signed the No Lien Agreement and the Subordination

Agreement. The Court does not find the testimony of the Olszeskis that these documents were

secretly included to defraud them as credible.

The Court finds that there was no intentional misrepresentation by Wilson or false

pretense regarding HG's loan with KeyBank. The Olszeskis argue that he failed to tell them that

HG was in default of the KeyBank loan because of HG's guaranty of the Note. Wilson testified

credibly that he believed the No Lien Agreement resolved any issue on the limitations of HG to

give the guaranty. In addition, the only evidence of a restriction by KeyBank was HG's

organizational documents that contained restrictions. The note to KeyBank submitted in evidence

did not contain restrictions. No other loan documents from KeyBank were submitted in evidence.

There also was no evidence that KeyBank declared HG in default due to the HG guaranty at any

time.

The Court finds that the Olszeskis failed to show by a preponderance of the evidence that

they relied on such any such alleged misrepresentation or false pretense, or that any such reliance was justified. None of the Olszeskis dealt directly with Wilson. Neither Zumbar nor Michael Tortola, who conducted the negotiations on behalf of the Olszeskis, stated that such an issue would have affected the transactions. The Olszeskis were represented by competent counsel. Since the Olszeskis were receiving a guaranty from HG, the restrictions of HG in its corporate documents would have been reviewed by their counsel.

The Court also does not find that any postclosing transfers, even if proven, are a basis to find the debt of $3.53 million is nondischargeable. The Olszeskis claim that as a result of the transfers, the $3.53 million debt arising from the Note is nondischargeable. The Olszeskis did not assert claims as creditors of HG and OP for fraudulent transfers by Wilson made with fraudulent intent. They also did not assert claims to pierce the corporate veil of HG or OP and reach Wilson for the debts of those entities. Any such debts of Wilson to the Olszeskis, if they existed, were discharged.

Congress specifically limited the reach of Section 523(a)(2) of the Code to the initial debt, a refinancing, renewal, extension, or forbearance if obtained by false pretenses, false representations, or actual fraud. Section 523 does not include actions to collect a debt as one of the bases to find the original debt nondischargeable. The Olszeskis did not refinance, renew, extend or forbear from acting on the Note. They now seek to challenge Wilson's actions to thwart their collection efforts. But such efforts do not turn the preexisting debt based on the Note that was dischargeable into a nondischargeable debt. *See In re Gaddy*, 977 F.3d at 1058.

This case is distinguishable from *Husky*, which involved debts that were traceable to a fraudulent conveyance made with actual intent to defraud. In *Husky,* the creditor of a corporation asserted claims against a shareholder personally for the corporate debt due to fraudulent

transfers, based on state law permitting a piercing of the corporate veil. The Supreme Court held that a fraudulent transfer made with the actual intent to hinder, defraud, or delay a creditor was a form of actual fraud. The Supreme Court found that debt of the recipient of fraudulently conveyed assets could be "traceable to" and thus obtained by the fraudulent transfer. *Husky*, 578 U.S. at 365. But the Supreme Court distinguished the liability of the transferor, noting the transferor does not obtain a debt in a fraudulent conveyance. *Id*.

In this case, Wilson is the alleged transferor, not the recipient, of transfers allegedly made to thwart collection of his prior debt. The obligation of Wilson for $3.53 million was not traceable to or obtained by any alleged transfers that occurred years after the debt was incurred under the Note. As the Eleventh Circuit has held, there is no authority to support the argument "that a debtor's fraudulent conveyance of assets in an attempt to avoid collection of a preexisting debt renders that preexisting debt exempt from discharge under § 523(a)(2)(A)." *In re Gaddy*, 977 F.3d at 1058.

Even if the Olszeskis had asserted there was a separate debt based on alleged fraudulent transfers, the Olszeskis have failed to prove by a preponderance of the evidence that the transfers occurred. The Olszeskis presented no business records or other evidence that showed that the transfers were made. The judgment against third parties is not evidence against Wilson that the transfers occurred. As discussed above, the testimony of Cooper and Zumbar that they observed transfers was not admissible. But even if the testimony of Cooper and Zumbar was admitted, the testimony simply reflects certain transfers were made, without any other evidence. Such evidence alone is insufficient to sustain the Olszeskis' burden of proof that the transfers were made.

The Olszeskis have also failed to show by a preponderance of the evidence that any such

transfers were made by Wilson with the actual intent to hinder, delay or defraud the Olszeskis. The Olszeskis were not entitled to any payments on the Note until June 1, 2009. The Olszeskis were not entitled to any distributions from any of the entities. Wilson testified that he considered the income to be available to him for distributions. He also testified credibly that he always premised payment of the Note on refinancing or obtaining a new tenant. Simches testified that records were kept and recorded regarding distributions and intercompany transfers.

None of the other post-closing actions complained of by the Olszeskis are a basis for a finding that the debt of $3.53 million was nondischargeable. As reflected above, the only debt that the Olszeskis assert is nondischargeable in the Amended Complaint is the debt of $3.53 million. The other post-closing actions occurred well after the debt of $3.53 million was incurred on May 31, 2006. The actions may have been a breach of Wilson's agreements with the Olszeskis. But the Olszeskis did not claim that they had a debt for damages for the breach of such agreements that was nondischargeable.

The Olszeskis have also failed to sustain their burden of proof that such actions rose to the level of actual fraud. The Olszeskis complain that board meetings were not held but provided no evidence as to when and how frequently they were required under the bylaws of HG and OP. Nor do the Olszeskis show their damages for the failure to hold board meetings, particularly since Wilson had the majority voting power. It is true that Wilson filed the HG and OP bankruptcies without notifying Ms. Tortola. But again, there is no showing of the damages to the Olszeskis from such action, since no record of the bankruptcies or the reason for their dismissal was submitted.

**CONCLUSION**

For the foregoing reasons, the Court finds that the Olszeskis have failed to sustain their

burden of proof that the debt of $3.53 million is nondischargeable under Section 523(a)(2) of the

Code.

The Court will enter a judgment in favor of Wilson consistent with this decision.


Dated:      March 24, 2025                          By the Court,




                                                    _____
                                                    Janet E. Bostwick
                                                    United States Bankruptcy Judge